WILLIAM N. CARLON (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
Phone: (530) 514-4115
Email: william@carlonlaw.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

DREVET HUNT (State Bar No. 240487)
California Coastkeeper Alliance
1100 11th Street
Sacramento, CA 95814
Phone: (415) 606-0864
Email: dhunt@cacoastkeeper.org

NATALIE HERENDEEN (State Bar No. 299286)
Monterey Waterkeeper
P.O. Box 4311
Salinas, CA 93912
Phone: (831) 204-1381
Email: natalie@montereywaterkeeper.org

Attorneys for Plaintiff
MONTEREY WATERKEEPER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE and MONTEREY WATERKEEPER,<br><br>Plaintiffs,<br>vs.<br><br>TAYLOR FARMS CALIFORNIA, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

California Sportfishing Protection Alliance ("CSPA") and Monterey Waterkeeper ("MWK") (CSPA and MWK collectively shall be referred to as "Plaintiffs"), by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act," "CWA," or "Act") against Taylor Farms California, Inc. ("Defendant"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation). The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.     On September 11, 2025, Plaintiffs provided written notice to Defendant, via certified mail, of Defendant's violations of the Act ("CWA Notice Letter"), and of its intention to file suit against Defendant, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991). Plaintiffs mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Director of the Central Coast Bay Regional Water Quality Control Board ("Regional Board"); and the U.S. Attorney General of the U.S. Department of Justice, pursuant to 40 C.F.R. § 135.2(a)(1) (1991). A true and correct copy of Plaintiffs' CWA Notice Letter is attached hereto as **Exhibit 1**, and is incorporated by reference.

3.     More than sixty days have passed since Plaintiffs served this CWA Notice Letter on Defendant and the agencies. Plaintiffs are informed and believe, and thereupon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Northern District of California pursuant to Section

505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), and Civil Local Rule 3-2(e) because the source of the violations is located within this District. The matter is properly heard in the San Jose Division because the source of the violations is located within Monterey County, California. Civil Local Rules 3-2(c) and (e).

## II.    **INTRODUCTION**

5.      This Complaint seeks relief for Defendant's violations of the CWA at a facility owned and/or operated by Defendant.  Defendant's facility is located at 1207 Abbot Street in Salinas, California 93901 ("Facility").

6.      Defendant discharges pollutant-contaminated storm water from the Facility into municipal storm drains that discharge to Alisal Creek, which flows to the Reclamation Ditch, which flows to Carr Lake. Carr Lake is a tributary to Natividad Creek, which flows to Tembladero Slough, which flows to the Old Salinas River, which flows to Monterey Bay via Elkhorn Slough, and then ultimately to the Pacific Ocean (collectively, Alisal Creek, the Reclamation Ditch, Carr Lake, Natividad Creek, Tembladero Slough,  Old Salinas River, Elkhorn Slough, Monterey Bay, and the Pacific Ocean are referred to as the "Receiving Waters").

7.      The Receiving Waters are waters of the United States.

8.      Defendant is violating both the substantive and procedural requirements of the CWA.

9.      Defendant's discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 14-57-DWQ as amended by Order 2015-0122-DWQ & Order 2018-0028-DWQ ("General Permit" or "Permit").

10.     Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

11.     The failure on the part of industrial facility operators such as Defendant to comply

Complaint For Declaratory and                    3                    Case No.
Injunctive Relief and Civil Penalties

with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Receiving Waters. With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

12.    Heavy metals that accumulate in lakes, oceans, rivers and streams threaten the environment and can instigate health problems and genetic changes in aquatic life, birds and other animals dependent on these waterbodies. These metals in water cannot be easily metabolized by aquatic organisms and can become enriched in organs such as the liver and kidney. Studies show that heavy metals can enter aquatic animals through their gills or during feeding and bind with substances in the bodies of wildlife. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those

sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

13.    Monterey Bay is an ecologically sensitive region that provides critical habitat for numerous species of cetaceans, pinnipeds, fish, birds, and both macro- and micro-invertebrates.

14.    Monterey Bay supports many recreational activities, including swimming, surfing, scuba diving, and kayaking, which depend on maintaining high water quality standard.

15.    Monterey Bay supports non-contact recreation and aesthetic opportunities, such as hiking, running, biking, and wildlife observation.

16.    Industrial facilities, like Defendant's, that discharge storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits Monterey Bay has for locals and visitors alike.

17.    Controlling polluted storm water discharges associated with industrial activity is essential to protecting California's surface and coastal waters and essential to Plaintiffs' missions.

III.    **PARTIES**

18.    CSPA is a 501(c)(3) non-profit public benefit corporation organized under the laws of California. CSPA's primary address and office is located at 1608 Francisco St., Berkeley, California.

19.    CSPA's members live and/or recreate in and around Monterey Bay. CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

Complaint For Declaratory and            5            Case No.
Injunctive Relief and Civil Penalties

20.    CSPA members work, own homes and live in Monterey County and use and enjoy the waters near the Facility, including the Receiving Waters, nearby waterfronts, bordering parks, pathways, and athletic fields, for fishing, biking, sailing, boating, kayaking, viewing wildlife, walking, running, and engaging in scientific study, including habitat monitoring and restoration activities.

21.    Discharges of polluted storm water from the Facility degrade water quality and harm aquatic life in the Receiving Waters and impair CSPA's and its members' use and enjoyment of those waters.

22.    The violations of the General Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the General Permit and the Clean Water Act.

23.    Monterey Waterkeeper is a 501(c)(3) environmental, non-profit public benefit organization in accordance with the laws of the State of California. Using law, policy, and science, Monterey Waterkeeper protects and restores drinkable, fishable, and swimmable waters in the Monterey Region and along California's Central Coast for all to enjoy. Monterey Waterkeeper conducts outdoor education and policy advocacy to ensure that all Central Coast residents have access to clean waters. Monterey Waterkeeper's outdoor education activities for youth and families allow participants to enjoy water quality testing, wildlife viewing, kayaking, and hiking in Elkhorn Slough and Monterey Bay. Monterey Waterkeeper also actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, initiates enforcement actions on behalf of itself and its members.

24.    Monterey Waterkeeper's mailing address is P.O. Box 4311, Salinas, CA.

25.    Monterey Waterkeeper's members use and enjoy the Receiving Waters and the areas around them for recreation, such as kayaking, picnicking, fishing, hiking, as well as for enjoyment of wildlife, including nearby populations of marine mammals such as sea otters and seals. Unlawful discharges of pollutants from the Facility into these waters impairs Monterey

Waterkeeper's members' use and enjoyment of these waters.

26. Defendant's violations of the CWA and the General Permit, including but not limited to its failure to monitor and/or report discharges, also injures Monterey Waterkeeper's ability to further its mission to protect California's waters.

27. The interests of Monterey Waterkeeper and its members have been, are, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the General Permit.

28. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

29. The relief sought herein will redress the harms to Plaintiffs caused by Defendant's activities.

30. Defendant Taylor Farms California, Inc. is a corporation organized under the laws of Delaware, and registered with the State of California to conduct business in California.

31. Plaintiffs are informed and believe, and thereon allege, that Defendant is the owner of the Facility.

32. Plaintiffs are informed and believe, and thereon allege, that Defendant is the operator of the Facility.

33. Defendant is a "person" pursuant to the Act. 33 U.S.C. § 1362(5).

## IV.    LEGAL BACKGROUND

### A.    Clean Water Act

34. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

35. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

36.    The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

37.    A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

38.    The CWA regulates "relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett v. EPA*, 598 U.S. 651 (2023), quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006).

39.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity. *Id.* § 1342(p)(2)(B).

40.    Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

41.    An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day

for violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B.    California's General Industrial General Permit**

42.    Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

43.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

44.    The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997, again on April 1, 2014 (effective July 1, 2015), and again on November 6, 2018 (effective July 1, 2020),  pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.    Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

46.    Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit. A violation of the General Permit is a violation of the Act. *See* General Permit, Section XXI.A.

47.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

48.    The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP")

requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

49.    Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

50.    Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

51.    The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which are pollutant concentration values for industrial storm water discharges ("U.S. EPA Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective September 29, 2021.

52.    U.S. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a permittee facility achieve the statutory BAT/BCT standards. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

53.    The discharge of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that

achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2nd 914, 921-25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

54.    The following benchmarks have been established, effective September 29, 2021, for pollutants discharged by Defendant: total suspended solids – 100 mg/L; pH – 6.0-9.0 s.u.; aluminum – 1.1 mg/L; and, nitrate plus nitrite nitrogen – 0.68 mg/L.

55.    The Water Quality Control Plan for the Central Coast Region ("Basin Plan") sets forth water quality standards and prohibitions applicable to Defendant's storm water discharges from its Facility. The Basin Plan states that "[c]ontrollable water quality shall conform to the water quality objectives contained [in the Basin Plan]." Basin Plan at p. 49. The Basin Plan also provides that "when other conditions cause degradation of water quality beyond the levels or limits established as water quality objectives, controllable conditions shall not cause further degradation of water quality." *Id.*

56.    The Basin Plan specifies existing beneficial uses for Monterey Bay and its tributaries, including Alisal Creek, including municipal and domestic supply, agricultural supply, groundwater recharge, water contact recreation, non-contact water recreation, wildlife habitat, cold freshwater habitat, warm freshwater habitat, migration of aquatic organisms, and commercial and sport fishing. *Id.* at Table 2-1.

57.    Discharges with pollutant levels in excess of EPA Benchmarks, the standards set forth in the Basin Plan, and/or other applicable water quality standards are violations of Section VI.A of the General Permit.

58.    The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

1    59.    Dischargers must revise their SWPPP whenever necessary and certify and submit

2    via the Regional Board's Storm Water Multiple Application and Report Tracking System

3    ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant

4    revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three

5    (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

6    60.    Dischargers must implement the minimum BMPs identified in Section X.H.1. of

7    the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced

8    BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm

9    water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

10    61.    Special Conditions Section XX.B of the General Permit require a discharger to

11    prepare and submit documentation to the Regional Board upon determination that storm water

12    discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must

13    describe changes the discharger will make to its current BMPs in order to prevent or reduce any

14    pollutant in its storm water discharges that is causing or contributing to an exceedance of water

15    quality standards.  General Permit, Section XX.B.

16    62.    Section XV of the General Permit requires an annual evaluation of storm water

17    controls including the preparation of an evaluation report and implementation of any additional

18    measures in the SWPPP to respond to the monitoring results and other inspection activities within

19    90 days of the annual evaluation.

20    63.    The General Permit requires dischargers to eliminate all non-storm water

21    discharges to storm water conveyance systems other than those specifically set forth in Section IV

22    of the General Permit unless authorized by another NPDES permit.  General Permit, Section

23    III.B.

24    64.    The General Permit requires dischargers to implement a Monitoring

25    Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers

26    must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers

27    must then conduct monthly visual observations of each drainage area, as well as visual

28    observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  General Permit, Section XI.B.6.

65.    Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit, and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

66.    Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

67.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See General Permit, Section XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. See General Permit, Section XII.C.

68. Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. See General Permit, Section XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of General Permit. See General Permit Section XII.C.1.a-c.

69. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. See General Permit, Section XII.C.1.c.

70. Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* General Permit, Section XII.C.2.a.i-ii. The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* General Permit, Section XII.C.2.a.iii.

71. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* General Permit, Section XII.C.2.b.

72. A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in

Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* General Permit, Section XII.D.

73.     A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, General Permit, Section XII.D.

V.     <u>**STATEMENT OF FACTS**</u>

   A.     **The Facility**

74.     Defendant owns and/or operates the Facility, a processing plant for fresh cut produce.

75.     According to the Facility's SWPPP, last updated in January 2025, the Facility's operating hours are seven days a week from 6:00 a.m. to 12:00 a.m.

76.     Defendant conducts industrial activities both indoors and outdoors at the approximately 24.5-acre Facility. Industrial activities at the Facility include, but are not limited to: washing, cutting, processing, and cold storage of fresh cut produce, operation of equipment in support of these activities, chemical storage, operation of forklifts, tote bin washing, carton and pallet storage, and equipment maintenance.

77.     The Facility operates under Standard Industrial Classification ("SIC") Codes 2099 ("Food Preparations, Not Elsewhere Classified") and 4222 ("Refrigerated Warehousing and Storage").

78.     Defendant most recently submitted a Notice of Intent to comply with the General Permit for the Facility on or about May 4, 2015.

79.     The Facility is assigned the Waste Discharge Identification Number 3 27I017307.

80.     Since at least May 4, 2015, the Facility has operated under General Permit coverage.

81.     Plaintiffs are informed and believes, and thereupon alleges, that Defendant collects and discharges storm water associated with industrial activities at the Facility through at least

three discharge points. The Facility's January 2025 SWPPP ("2025 SWPPP") indicates that there are two drainage areas at the Facility, an area that drains to an industrial waste conveyance system, and a storm water drainage area.  The 2025 SWPPP states that the areas related to industrial activities located in the storm water drainage area include the fresh produce loading and unloading area (truck docks), the employee parking area, and the carton and pallet storage area.

82.     The 2025 SWPPP indicates that two of the three discharge points (DP-1 and DP-2) are equipped with a diversion valve that allows flows to be diverted to the industrial waste system. According to the 2025 SWPPP, when each valve is opened, water flows into the municipal storm sewer system on Harkins Street, and from there into Alisal Creek, and ultimately into Monterey Bay. Plaintiffs are informed and believe, and thereupon allege, that past practice at the Facility was to leave the diversion valves closed during the seasonal operations, and open during the rest of the year. The 2025 SWPPP states that the Facility currently operates year-round and indicates that only DP-3 discharges storm water to the municipal storm sewer system.

83.     The areas of industrial activities are sources of pollutants at the Facility. In particular, pollutants of concern from these industrial areas and activities at the Facility include total suspended solids ("TSS"), oil and grease ("O&G"), aluminum ("Al"), iron ("Fe"), and nitrite plus nitrate nitrogen ("N+N"). Sources of these pollutants include the industrial activities discussed above, tracking of soils, dust, debris, and waste from other areas and offsite from trucks, leaks from trucks, trailers, equipment, and other vehicles. These pollutants are entrained in storm water runoff and can be tracked offsite by vehicles and other equipment. The industrial activities and areas of industrial activity discussed herein generate and release these pollutants from the Facility, and the Facility discharges them via storm water discharges to municipal storm drains that discharge to the Receiving Waters.

84.     Alisal Creek is a tributary of the Reclamation Ditch.

85.     Alisal Creek is a relatively permanent waterbody. Its headwaters begin in the hills east of Salinas and it flows south and east from there into the Reclamation Ditch.

86.     The Reclamation Ditch is a relatively permanent waterbody. It flows east to west and contains water during dry months. The Reclamation Ditch flows west to Carr Lake, at the

confluence of Natividad Creek and Gabilan Creek.

87.    The Reclamation Ditch is a tributary to Carr Lake and Natividad Creek.

88.    Natividad Creek drains Carr Lake and flows west to Tembladero Slough.

89.    Carr Lake is a relatively permanent waterbody.

90.    Natividad Creek is a relatively permanent waterbody.

91.    Tembladero Slough is a relatively permanent waterbody.

92.    Tembladero Slough is a tributary to Old Salinas River.

93.    Old Salinas River is a relatively permanent waterbody.

94.    Old Salinas River is a tributary of Elkhorn Slough.

95.    Elkhorn Slough is a relatively permanent waterbody.

96.    Elkhorn Slough is a tributary to Monterey Bay.

97.    Monterey Bay discharges to the Pacific Ocean.

98.    Alisal Creek is a water of the United States.

99.    The Reclamation Ditch is a water of the United States.

100.    Carr Lake is a water of the United States.

101.    Natividad Creek is a water of the United States.

102.    Tembladero Slough is a water of the United States.

103.    Old Salinas River is a water of the United States.

104.    Elkhorn Slough is a water of the United States.

105.    Monterey Bay is a water of the United States.

106.    The Pacific Ocean is a water of the United States.

**B.    The Facility's Storm Water Discharges**

107.    Defendant discharges storm water containing pollutants, including aluminum, iron, and nitrate plus nitrite nitrogen from the Facility during every significant rain event.

108.    The storm water sample collected by Defendant at the Facility's sampling point DP-3 on March 5, 2025 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

109.    The storm water samples collected by Defendant at the Facility's sampling points

DP-1, DP-2, and DP-3 on January 27, 2025 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

110.    The storm water samples collected by Defendant at the Facility's sampling points DP-1 and DP-3 on February 20, 2024 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

111.    The storm water samples collected by Defendant at the Facility's sampling points DP-1 and DP-3 on January 24, 2024 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

112.    The storm water samples collected by Defendant at the Facility's sampling points DP-1 and DP-3 on January 22, 2024 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

113.    The storm water sample collected by Defendant at the Facility's sampling point DP-3 on March 9, 2023 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

114.    The storm water samples collected by Defendant at the Facility's sampling points DP-2 and DP-3 on December 5, 2022 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

115.    The storm water samples collected by Defendant at the Facility's sampling points DP-2 and DP-3 on December 1, 2022 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

116.    The storm water samples collected by Defendant at the Facility's sampling points DP-1 and DP-2 on March 19, 2022 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

117.    The storm water samples collected by Defendant at the Facility's sampling points DP-2 and DP-3 on December 13, 2021 contained aluminum concentrations in excess of the U.S. EPA Benchmark for aluminum.

118.    The storm water sample collected by Defendant at the Facility's sampling point DP-2 on March 10, 2021 contained aluminum concentrations in excess of the U.S. EPA

1  Benchmark for aluminum.

2        119.    The storm water samples collected by Defendant at the Facility's sampling points

3  DP-2 and DP-3 on February 2, 2021 contained aluminum concentrations in excess of the U.S.

4  EPA Benchmark for aluminum.

5        120.    The storm water sample collected by Defendant at the Facility's sampling point

6  DP-3 on January 27, 2021 contained aluminum concentrations in excess of the U.S. EPA

7  Benchmark for aluminum.

8        121.    The storm water samples collected by Defendant at the Facility's sampling points

9  DP-2 and DP-3 on March 5, 2025 contained concentrations of nitrate plus nitrite nitrogen in

10  excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

11        122.    The storm water samples collected by Defendant at the Facility's sampling points

12  DP-2 and DP-3 on January 27, 2025 contained concentrations of nitrate plus nitrite nitrogen in

13  excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

14        123.    The storm water sample collected by Defendant at the Facility's sampling point

15  DP-2 on December 12, 2024 contained concentrations of nitrate plus nitrite nitrogen in excess of

16  the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

17        124.    The storm water sample collected by Defendant at the Facility's sampling point

18  DP-2 on February 20, 2024 contained concentrations of nitrate plus nitrite nitrogen in excess of

19  the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

20        125.    The storm water samples collected by Defendant at the Facility's sampling points

21  DP-1, DP-2, DP-3 on January 24, 2024 contained concentrations of nitrate plus nitrite nitrogen in

22  excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

23        126.    The storm water samples collected by Defendant at the Facility's sampling points

24  DP-2 and DP-3 on January 22, 2024 contained concentrations of nitrate plus nitrite nitrogen in

25  excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

26        127.    The storm water samples collected by Defendant at the Facility's sampling points

27  DP-2 and DP-3 on December 5, 2022 contained concentrations of nitrate plus nitrite nitrogen in

28  excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

Complaint For Declaratory and                        19                        Case No.
Injunctive Relief and Civil Penalties

128.    The storm water sample collected by Defendant at the Facility's sampling point DP-2 on December 1, 2022 contained concentrations of nitrate plus nitrite nitrogen in excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

129.    The storm water samples collected by Defendant at the Facility's sampling points DP-1 and DP-2 on March 19, 2022 contained concentrations of nitrate plus nitrite nitrogen in excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

130.    The storm water sample collected by Defendant at the Facility's sampling point DP-1 on February 2, 2021 contained concentrations of nitrate plus nitrite nitrogen in excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

131.    The storm water sample collected by Defendant at the Facility's sampling point DP-1 on January 22, 2021 contained concentrations of nitrate plus nitrite nitrogen in excess of the U.S. EPA Benchmark for nitrate plus nitrite nitrogen.

132.    A true and accurate summary of the data (as reported under penalty of perjury by Defendant to the State Board via the SMARTS database) that are the basis for the allegations contained in paragraphs 106-129 is contained in Section 3 of the CWA Notice Letter.

133.    Exceedances of the U.S. EPA Benchmarks evidence repeated failures to develop, implement, and/or maintain BMPs for the Facility that achieve BAT/BCT-level pollutant reductions.

134.    Failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions are violations of the General Permit's technology-based effluent limitations and the Act.

135.    Storm water samples collected by Defendants from the Facility during the 2024-2025 reporting year contained concentrations of aluminum in excess of the NALs for aluminum.

136.    Storm water samples collected by Defendants from the Facility during the 2023-2024 reporting year contained concentrations of aluminum in excess of the NALs for aluminum.

137.    Storm water samples collected by Defendants from the Facility during the 2022-2023 reporting year contained concentrations of aluminum in excess of the NALs for aluminum.

138.    Storm water samples collected by Defendants from the Facility during the 2021-

2022 reporting year contained concentrations of aluminum in excess of the NALs for aluminum.

139.    Storm water samples collected by Defendants from the Facility during the 2024-2025 reporting year contained concentrations of aluminum in excess of the NALs for iron.

140.    Storm water samples collected by Defendants from the Facility during the 2023-2024 reporting year contained concentrations of aluminum in excess of the NALs for iron.

141.    Storm water samples collected by Defendants from the Facility during the 2022-2023 reporting year contained concentrations of aluminum in excess of the NALs for iron.

142.    Storm water samples collected by Defendants from the Facility during the 2021-2022 reporting year contained concentrations of aluminum in excess of the NALs for iron.

143.    Storm water samples collected by Defendants from the Facility during the 2020-2021 reporting year contained concentrations of aluminum in excess of the NALs for iron.

144.    Storm water samples collected by Defendants from the Facility during the 2024-2025 reporting year contained concentrations of aluminum in excess of the NALs for nitrate plus nitrite nitrogen.

145.    Storm water samples collected by Defendants from the Facility during the 2023-2024 reporting year contained concentrations of aluminum in excess of the NALs for nitrate plus nitrite nitrogen.

146.    Storm water samples collected by Defendants from the Facility during the 2022-2023 reporting year contained concentrations of aluminum in excess of the NALs for nitrate plus nitrite nitrogen.

147.    Storm water samples collected by Defendants from the Facility during the 2021-2022 reporting year contained concentrations of aluminum in excess of the NALs for nitrate plus nitrite nitrogen.

148.    Each industrial process undertaken by Defendant at the Facility represents a pollutant source that, pursuant to the General Permit, must be disclosed, assessed, and controlled to prevent or limit pollutant concentrations in storm water discharges. General Permit, § X.G.1-2.

149.    The 2025 SWPPP, and each preceding version of the SWPPP for the Facility, fails to adequately evaluate the effectiveness of the BMPs implemented at the Facility.

150.    Plaintiffs are informed and believe, and thereupon allege, that Defendant has failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

151.    Defendant's SWPPP does not include a compliant site map, adequate pollutant source descriptions or assessments, adequate BMPs or descriptions of BMPs.

152.    The discharge of storm water from the Facility containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop, implement, and revise a lawful SWPPP.

153.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the General Permit.

154.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the General Permit.

155.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the General Permit.

156.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the General Permit.

157.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Section XI of the General Permit.

158.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the General Permit in violation of Section XI of the General Permit.

159.    Plaintiffs are informed and believe, and thereon allege, that Defendant consistently fail to perform adequate visual observations of storm water during QSEs.

160.    Plaintiffs are informed and believe, and thereon allege, that Defendants have

consistently failed and continue to fail to report any noncompliance with the General Permit at the time that the Annual Report is submitted.

161.    Plaintiffs are informed and believe, and thereon allege, that Defendant did not report its non-compliance as required by the General Permit.

162.    Plaintiffs are informed and believe, and thereon allege, that the Facility's ERA Reports from recent reporting years were insufficient, requiring ineffective BMPs and no substantial advanced BMP upgrades resulting in continuing noncompliance with the General Permit.

163.    Plaintiffs are informed and believe, and thereon allege, that Defendant fails to collect sufficient storm water samples during QSEs.

164.    Information available to Plaintiffs also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the General Permit and/or the CWA.

165.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the General Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Defendant's Discharges of Contaminated Storm Water from the Facility
Violate the General Permit's Effluent Limitations and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

166.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

167.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

168.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure

to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit and the CWA. See General Permit, Section I.D. (Finding 32), Effluent Limitation V.A.; 33 U.S.C. § 1311(b).

169.    Defendant violates and will continue to violate the General Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

170.    Plaintiffs are informed and believe, and thereon allege, that Defendant's violations of Effluent Limitations of the General Permit and the CWA are ongoing and continuous.

171.    Each day, since at least November 23, 2020, that Defendant discharges storm water containing pollutants in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

172.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 23, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

173.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

174.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

175.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

<u>SECOND CLAIM FOR RELIEF</u>
**Defendant's Failure to Prepare, Implement, Review, and
Update a Compliant Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

176.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

177.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to develop and implement an adequate SWPPP for the Facility.

178.    Plaintiffs are informed and believe, and thereon allege, that Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b. Defendant continues to be in violation of the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

179.    Defendant's violations of the General Permit's SWPPP requirements are ongoing and continuous.

180.    Each day since November 23, 2020 that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

181.    Defendant has been in violation of the General Permit's SWPPP requirements every day since November 23, 2020.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

182.    Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from November 23, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

183.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiffs and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

184.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

185.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### THIRD CLAIM FOR RELIEF
**Defendant's Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

186.     Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

187.     Plaintiffs are informed and believe, and thereon allege, that Defendant has failed, and continues to fail, to reduce or prevent pollutants associated with its industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT treatment standards.

188.     Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

189.     Plaintiffs are informed and believe, and thereon allege, that Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

190.     Plaintiffs are informed and believe, and thereon allege, that Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

191.     Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

192.     Defendant's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

193.     Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from November 23, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

194.     An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiffs and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

Complaint For Declaratory and                    26                    Case No.
Injunctive Relief and Civil Penalties

195.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

196.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

**FOURTH CLAIM FOR RELIEF**
**Defendant's Failure to Develop, Implement, and Revise an Adequate**
**Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

197.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

198.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to develop a legally adequate monitoring and reporting program for the Facility.

199.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to implement a legally adequate monitoring and reporting program for the Facility.

200.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to adequately revise their monitoring and reporting program for the Facility.

201.    Defendant's violations of the General Permit's Monitoring Plan requirements and the Act are ongoing and continuous.

202.    Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from November 23, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

203.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiffs and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

204.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

205.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

**FIFTH CLAIM FOR RELIEF**
**Defendant's Failure to Report as Required by the General Permit in Violation of the**

**General Permit and the Clean Water Act**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

206.    Plaintiffs re-allege and incorporates all preceding paragraphs as if fully set forth herein.

207.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to accurately report their non-compliance with the General Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the General Permit.

208.    Defendant has been in violation of Sections XVI and XX of the General Permit since at least November 23, 2020.

209.    Defendant's violations of the General Permit's reporting requirements and the Act are ongoing and continuous.

210.    Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from November 23, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

211.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm CSPA and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

212.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

213.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

    a.    Declare Defendant to have violated and to be in violation of the General Permit and the Clean Water Act as alleged herein;

    b.    Enjoin Defendant from discharging polluted storm water from the Facility

except as authorized by the General Permit;

      c.    Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

      d.    Order Defendant to immediately implement storm water pollution control technologies and measures that satisfy BAT and BCT and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

      e.    Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

      f.    Order Defendant to prepare a SWPPP for its Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

      g.    Order Defendant to pay civil penalties of $68,445 per day per violation for all violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

      h.    Order Defendant to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by their activities;

      i.    Award Plaintiffs' costs and fees (including reasonable investigative, attorney, witness, compliance oversight and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

      j.    Award any such other and further relief as this Court may deem appropriate.

Dated: January 22, 2026          Respectfully Submitted,

LAW OFFICE OF WILLIAM CARLON

By:   /s/ William N. Carlon
      William N. Carlon
      Attorneys for Plaintiff
      CALIFORNIA SPORTFISHING
      PROTECTION ALLIANCE

CALIFORNIA COASTKEEPER ALLIANCE

By:    /s/ Drevet Hunt
           Drevet Hunt
           Attorneys for Plaintiff
           MONTEREY WATERKEEPER

MONTEREY WATERKEEPER

By:    /s/ Natalie Herendeen
           Natalie Herendeen
           Attorneys for Plaintiff
           MONTEREY WATERKEEPER